**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| TY ONE HOLDINGS LLC, TROCA TYNGSBORO HOTEL LLC, BOSTON EAST BRUNSWICK HOLDINGS LLC, and TROCA HOLDINGS LLC <br><br> Plaintiffs, <br><br> v. <br><br> BLACK WIDOW CUSTOM CASES LLC, BLACK WIDOW CUSTOM CASES INC., ACOUSTIC ALLIES, LLC, DOGGY STYLE MUSIC, INC., DOGGY STYLE RECORDS, INC., DOGGY STYLE RECORDS SOUTH, STAMPEDE MANAGEMENT, JAMES FULLER, THOMAS HEJNICKI, and CALVIN CORDOZAR BROADUS JR. a/k/a "SNOOP DOGG" <br><br> Defendants. | **Civil Action No.:** <br><br> **JURY TRIAL DEMANDED** |

<u>**COMPLAINT AND DEMAND FOR JURY TRIAL**</u>

Plaintiffs, TY One Holdings LLC ("TY One"), Troca Tyngsboro Hotel LLC ("Troca Tyngsboro"), and Troca Holdings LLC ("Troca Holdings")(collectively the "Troca Companies") together with Boston East Brunswick Holdings LLC ("Boston East")(each a "Plaintiff" and collectively, or in the case of more than one Plaintiff, the "Plaintiffs") file this action against Defendants Black Widow Custom Cases LLC and Black Widow Custom Cases Inc. d/b/a Black Widow Boat Works (each and collectively "Black Widow"); Defendant Acoustic Allies, LLC ("Acoustic Allies"); Defendants Doggy Style Music Inc., Doggy Style Records, Inc., and Doggy Style Records South (each and collectively "Doggy Style"); Defendant Stampede Management

1

(hereinafter "Stampede"); Defendant James Fuller a/k/a Chad Fuller (hereinafter "Fuller"); Defendant Thomas Hejnicki ("Hejnicki") and Defendant Cordozar Broadus Jr. a/k/a/ and d/b/a Snoop Dogg (hereinafter "Snoop Dogg")(each a "Defendant", and collectively, or in the case of more than one Defendant, "Defendants") because their bad faith acts and omissions, in violation of law, severally and collectively, caused Plaintiffs significant harm, violated Plaintiffs' trademarks, interfered with Plaintiff's business and contractual relations with third parties, converted Plaintiffs' property, and slandered title to Plaintiffs' primary asset -- a 108 foot Viking superyacht; the facts of which form the basis for the claims brought forth against defendants as described herein.

## **PARTIES**

1.     Defendant Black Widow Custom Cases LLC is a Florida limited liability company with (i) a principal place of business at 1720 Main St, Unit 5, Palm Bay, FL 32905, (ii) a registered address of 969 Tavernier Circle NE, Palm Bay, FL 32905, and (iii) a registered agent identified as Sara A. Fuller, currently residing at 370 Brightwater Dr SE, Palm Bay, FL 32909, which was voluntarily dissolved on February 8, 2019 but continued operation through at least December 2020 as a billing agent for Defendants.

2.     Defendant Black Widow Custom Cases, Inc. is a Florida corporation operating both as Black Widow Custom Cases and Black Widow Boat Works, which is a contractor operating on behalf of and in conjunction with Defendants with a (i) principal place of business at 1720 Main St, Unit 5, Palm Bay, FL 32905, (ii) a mailing address of 370 Brightwater Drive SE, Palm Bay, FL 32909, and (iii) a registered agent identified as James Fuller currently residing at 370 Brightwater Drive SE, Palm Bay, FL 32909.

2

3.     Defendant Acoustic Allies, LLC is a Florida limited liability company with (i) a principal place of business, registered address and mailing address at 1350 Paragon Road SE, Palm Bay, FL 32909 and (ii) a registered agent identified as Thomas L. Hejnicki, currently residing at 1350 Paragon Road SE, Palm Bay, FL 32909, which was involuntarily dissolved for lack of annual report filing on September 29, 2019 but continued operation through at least December 2020 as a contractor operating on behalf of and in conjunction with Defendants.

4.     Defendant Doggy Style Music, Inc. is a California corporation with a (i) principal place of business at 1800 Century Park East, Suite 200, Los Angeles, CA 90067 and (ii) a registered agent identified as Selwyn Gerber, Geber & Co. Inc., 1800 Century Park East, Suite 200, Los Angeles, CA 90067 which is a record and music company and label which produces music, videos and other lifestyle products associated with and promoted by the artist known popularly as "Snoop Dogg."

5.     Defendant Doggy Style Records, Inc. is a California corporation with a (i) principal place of business at 1800 Century Park East, Suite 200, Los Angeles, CA 90067 and (ii) a registered agent identified as Selwyn Gerber, Geber & Co. Inc., 1800 Century Park East, Suite 200, Los Angeles, CA 90067 which is a record and music company and label which produces music, videos and other lifestyle products associated with and promoted by the artist known popularly as "Snoop Dogg."

6.     Defendant Doggy Style Records South is a subsidiary of and considered the "southern division" of Defendant Doggy Style and controlled by Defendant Snoop Dogg with a principal place of business at 1800 Century Park East, Suite 200, Los Angeles, CA 90067 which produces music, videos and other lifestyle products focused on artists, musicians and talent from Texas, Mississippi, Louisiana, and the "deep South."

7. Defendant Stampede Management is an entity controlled by Defendant Snoop Dogg's manager and business partner Ted Chung with principal place of business at 12555 W. Jefferson Blvd Suite 150, Los Angeles, CA 90066 which manages the business affairs of Defendants Doggy Style and Snoop Dogg and advises those entities on operations and development.

8. Defendant James Fuller is an individual residing at 370 Brightwater Drive SE, Palm Bay, FL 32909 who is employed by and consultant to Defendants Doggy Style and Snoop Dogg, operates Defendant Black Widow and works in concert with Defendants Hejnicki and Acoustic Allies.

9. Defendant Thomas Hejnicki is an individual residing at 1350 Paragon Road SE, Palm Bay, FL 32909 who operates Defendant Acoustic Allies, is employed by and is a consultant to Defendant Black Widow and works in concert with Defendant Fuller.

10. Defendant Calvin Cordozar Broadus Jr. is an individual residing at 7550 Smallwood Place, Rancho Cucamonga, CA 91730-8221 who owns and manages Defendant Doggy Style and employs, works with and directs the actions of Defendants Fuller and Black Widow.

11. Plaintiff TY One Holdings LLC is a Florida limited liability company with a principal place of business at 733 Turnpike Street in North Andover, MA and a registered address of 2423 SW 147th Ave # 657, Miami FL 33185 which owns a 108' Viking yacht named "Troca One" documented and registered with the United States Coast Guard.

12. Plaintiff Troca Tyngsboro Hotel LLC is a Massachusetts company with a principal place of business at 733 Turnpike Street in North Andover, MA. Tyngsboro is an operating partner of TY One for the repair, restoration, maintenance, and operation of Troca One.

13.     Plaintiff Boston East Brunswick Holdings LLC is a Massachusetts company with a principal place of business at 733 Turnpike Street in North Andover, MA. Boston East is an investor and operating partner of TY One for the repair and restoration of Troca One.

14.     Troca Holdings LLC is a Massachusetts company with a principal place of business at 733 Turnpike Street in North Andover, MA.  Troca Holdings is the owner of "Troca One", "Troca Hotels", "Troca Hotels & Yachts" and "Troca" trademarks, used to develop, brand and market Troca One.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over these claims, including: (A) original jurisdiction and federal question jurisdiction pursuant to 46 U.S.C. § 31343 because this action involves a maritime lien claim against a vessel navigating the waters of the United States; (B) original jurisdiction pursuant to Section 39 of the Lanham Act, 15 U.S.C. § 1121; (C) original jurisdiction pursuant to 28 U.S.C. § 1338(a) and (b) because this action arises under any Act of Congress relating to trademarks and asserts claims of unfair competition; (D) original jurisdiction and diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and there is diversity of citizenship between the parties; and (E) supplemental jurisdiction the principles of supplemental jurisdiction over related state law claims under 28 U.S.C. § 1367.

16.     Section 1333 of Title 28 provides that the district courts shall have original jurisdiction of any civil case of admiralty or maritime jurisdiction. 28 U.S.C. § 1333; The judicial power of federal courts extends to all cases of admiralty and maritime jurisdiction - the constitutional provision was incorporated into the first Judiciary Act in 1789, and federal courts have retained "admiralty or maritime jurisdiction" since then. See 28 U.S.C. § 1333(1). Cal. v. Deep Sea Research, 523 U.S. 491, 501, 118 S. Ct. 1464, 1470, 140 L. Ed. 2d 626, 636, 1998 U.S.

LEXIS 2788, \*18, 66 U.S.L.W. 4286, 98 Cal. Daily Op. Service 3000, 98 Daily Journal DAR 4083, 1998 AMC 1521, 1998 Colo. J. C.A.R. 1919, 11 Fla. L. Weekly Fed. S 460 (U.S. April 22, 1998)

17.     Defendants are subject to the personal jurisdiction in this Court pursuant to the Massachusetts long-arm statute, M.G.L. c. 223A, and the Due Process Clause of the Fourteenth Amendment by virtue of their systematic and continuous contact in this judicial district, conduct of business and frequent business travel in Massachusetts, and causing tortious injury by acts or omissions to Massachusetts citizens within Massachusetts.

18.     Venue is proper in this district under 28 U.S. § 1391 because a substantial part of the goodwill and intellectual property that is the subject of the action is situated in this district, all parties do business in this judicial district, Defendants' advertising activities using the Infringing Marks have given rise to Plaintiffs' claims and Defendants are subject to personal jurisdiction in this district with respect to this action and there is no other district in which the action may otherwise be brought.

## STATEMENT OF FACTS
### *History of Troca One*

19.     On May 11, 2017, TY One acquired a 108' marine vessel named "Kristina" originally sold by the Viking Yacht Company (the "Yacht") and received acquisition financing for the Yacht from M&T Bank Corporation ("MTB").

20.     At the time of its acquisition of the Yacht, TY One signed a license agreement with Troca Holdings to recommission the Yacht as "Troca One" and promote the "Troca" brand and "Troca One" brand (each a "Troca Brand" and collectively the "Troca Brands") on the Yacht. The Troca Brands are trademarks of Troca Holdings.

21.    In early May 2018, while under the command of Captain Paul R. Querze, the Yacht ran aground in shallow waters of the intercoastal waterway near Coco Beach, Florida and sustained significant damage (the "Grounding").

22.    After consulting with Travelers Insurance ("Travelers"), Plaintiffs hired a recovery crew and captain to secure the Yacht, protect it from further damage, and transport it in its damaged state to a suitable marine repair facility. Due to delays by Travelers and a dispute as to the scope of coverage for the Yacht (the "Insurance Dispute"), however, the Yacht remains only partially repaired from the Grounding.

23.    To further advance the repairs to the Yacht and return it to service, Plaintiffs and MTB agreed that Plaintiffs would commission a comprehensive study detailing the current conditions of the Yacht and outlining an overview for repairs required thereto (the "Study Report") for a cost of up to $3,500 and actual travel expenses incurred.

24.    Since the Grounding, Plaintiffs and MTB have devoted significant capital, effort and legal attention to the resolution of various claims between multiple parties and entities resulting from the Grounding, including between Plaintiffs and MTB themselves.

25.    Plaintiffs sought to sell or refinance the Yacht after the completion of repairs resulting from the Grounding.

26.    Plaintiffs signed a brokerage agreement with Rick Obey Yacht Sales in Fort Lauderdale, Florida ("Rick Obey") listing the Yacht for sale on August 11, 2020.

27.    Defendants learned of Plaintiffs through brokers affiliated with Rick Obey.

28.    Attached hereto as Exhibit A are the text message from Defendants to Plaintiffs' representative Abhijit Das.

29.    Attached hereto as Exhibit B are emails communications between Defendants, Plaintiffs and certain third parties.

30.    Defendants sought owners of yachts with whom to partner for the development of their own boat charter business, ventures and brand. Compl. Ex. A 1:9-10.

### Defendants Snoop Dogg and Doggy Style

31.    Defendant Snoop Dogg is an American musician and entrepreneur with investments in various sectors of entertainment, food, and cannabis.

32.    Defendant Snoop Dogg's investments are structured through various investment vehicles managed by different management companies. On information and belief, Defendant Snoop Dogg's investments in cannabis are made through Casa Verde Capital, a venture capital fund he controls, while his investments in entertainment, including Defendant Doggy Style, are managed by Defendant Stampede Management.

33.    Defendant Doggy Style is an entertainment and music company and record label consisting of one or more legal entities, including Doggy Style Records, Inc. and Doggy Style Records South, owned principally by Defendant Snoop Dogg and managed by Defendant Stampede Management.

34.    Attached hereto as Exhibit G are various examples of social media and internet publications from and/or regarding Defendants.

35.    Defendant Doggy Style Records South is actively sponsored and promoted by Defendant Snoop Dogg.

36.    The goal of such promotion and sponsorship is, among other things, to increase market penetration, awareness, and talent for Defendants' music and video business in the southern United States. Compl. Ex. G at 3-9.

37.    Defendant Doggy Style maintains a page on Instagram media platform entitled "Doggy Style Records South" using the handle doggystylerecordssouth, which has thousands of followers (the "Doggy South Instagram"). Compl. Ex. G at 1.  A recent screenshot from the platform, featuring images of Defendant Snoop Dogg is attached below:



38.    Defendants regularly post promotional materials and other works of interest to Defendants' fans and clients on Doggy South Instagram to promote all of Defendants' business and economic interests, including those of Defendants' other businesses, and increase Defendants' brand value and awareness.

39.    Defendants Fuller, Hejnicki, Acoustic Allies and Black Widow are agents, representatives, partners, contractors and/or employees of Defendants Snoop Dogg and Doggy Style. Compl. Ex. A 4:7-8.

40.    Defendants Fuller, Hejnicki, Acoustic Allies and Black Widow have acted and continue to act on behalf of Defendants to acquire a yacht, launch a yacht business, and integrate them into Defendants' other businesses. Compl. Ex. A 4:21-23.

### *Defendants' Solicitation of Plaintiffs and Proposed Partnership*

41.    On or about August 5, 2020, Defendants first contacted Plaintiffs seeking marine business and partnership opportunities. Compl. Ex. A 1:2-3.

42.    On several occasions in late August and early September 2020, Defendants sought out and solicited Plaintiffs, offering to assist in the restoration of the Yacht by providing services in exchange for potential equity, investment, barter for services, and marketing opportunities. Compl. Ex. A 4:4-5("So my thoughts to you is maybe we can have a long-term relationship and barter some services.").

43.    On September 1, 2020, Defendant Fuller proposed an exploratory trip to Boston, where the Yacht is docked, to evaluate the Yacht, propose repairs and restorations (the "Restoration Project").

### *Initial Contract to Produce Study Report*

44.    Plaintiffs advised Defendants that Plaintiffs had agreed with MTB to order the Study Report to understand the Yacht's current condition, the forensic trail thereto, and a path forward for repairs. Aff. of Abhijit Das ¶¶ 4-6.

45.    Defendants agreed to conduct the evaluation of the Yacht and prepare and issue the Study Report for a flat fee of $3,500 plus travel expenses. Id.

46.     In agreeing to a flat fee of $3,500 plus travel expenses, Defendants promised to provide a thorough study of the condition of the Yacht, determine and ascertain the cause of the damage to the Yacht after the Grounding, and analyze the cost to returning the Yacht to its condition prior to the Grounding. Id.

47.     Defendants agreed, in turn, to credit the $3,500 cost of the Study Report towards the Restoration Project, if Defendants were commissioned by TY One for repair services after the completion of the Study Report. Id.

48.     Defendants agreed to produce the Study Report because of their interest in future business dealings with Plaintiffs. Email from Chad Fuller, PM/FOH Snoop Dogg (Sept. 19, 2020, 22:28 EST)("We put a lot of time this week in it as for we are intrigued about the project and the work scope.")(Compl. Ex. B, at 4).

49.     Defendants published several posts regarding Plaintiffs and the Yacht on social media. Attached hereto as Exhibit F is a representative sample of such posts.

50.     Indeed, Defendants posted images of their time aboard Plaintiffs' Yacht on social media sites, with gleeful captions proclaiming their excitement with the Yacht and project. Compl. Ex. F at 1-10.

51.     Defendants agreed to produce the Study Report because of their interest in obtaining an equity interest in the Yacht.  Email from Chad Fuller, PM/FOH Snoop Dogg (Dec. 2, 2020, 14:19 EST)("I have never not wanted to start a Charter company.")(Compl. Ex. B, at 16).

52.     Defendants also communicated extensively with Kerry McAnistan, a third party associated with Plaintiffs. Attached hereto as Exhibit I are the text messages between Defendants and Kerry McAnistan.

11

53. Defendants' decisions to allocate often excessive amounts of time to the Study Report, Yacht and Restoration Project were admittedly and solely driven by their own curiosity, enjoyment, interest in promoting their partnership with Plaintiffs, and, because of Defendants' admitted drop in live music business during the COVID-19 pandemic, in their own words, "what else is there to do." Email from Chad Fuller, PM/FOH Snoop Dogg (Sept. 19, 2020, 22:28 EST)("We put a lot of time this week in it as for we are intrigued about the project and the work scope.")(Compl. Ex. B, at 1), Compl. Ex. I 14:33-34 ("I want to bring her back to her former glory."); Compl. Ex. I 49:15-23 (acknowledging the "revitalization that we all want to see happen and enjoy the work and the process to get there" and "what else is there to do."); Compl. Ex. I 23:40-43 ("Im waiting to find out the Captian [sic] Joe who drove boat up from Cocoa Florida had some wild sex party 200 miles off shore will taking her to Boston. Its gotta have a juicy ending").

54. Defendants did not request Plaintiffs' permission or authorization to allocate time to the Study Report, Yacht or Restoration Project.

55. Plaintiffs did not demand that Defendants spend excessive amounts of time on the Study Report, Yacht or Restoration Project.

56. Plaintiffs did not request Defendants to research or investigate past parties held by anybody aboard the Yacht.

57. On October 1, 2020, Defendants sent the proposed estimate for MTB to Plaintiffs. Attached hereto as Exhibit E are various invoices, estimates and communications from Defendants.

58.    On October 5, 2020, Defendants sent invoice # 245 for the Study Report in the amount of $3,500 to Plaintiffs listing a "discount" of $21,340 for 194 hours of labor utilized to produce it.  Compl. Ex. E, at 7-8.

59.    Defendants agreed to and billed at a rate of $18.04 per hour to produce the Study Report ("Study Report Rate"). Id.

60.    On October 26, 2020, a week after Defendants' second trip to the Yacht, Defendants issued their Study Report, attached hereto as Exhibit H.

61.    Defendants continued to work on the Study Report past the date of their invoice, October 5, 2020. Email from Chad Fuller, PM/FOH Snoop Dogg (Oct. 25, 2020, 22:53 EST)("Her [sic] is V5 revisions with addendum of our second trip.")(Compl. Ex B at 10).

62.    Defendants continued to work on the Study Report until the date they issued the Study Report, on October 26, 2020.  Id.

63.    The Study Report listed a review period of September 11, 2020 to October 19, 2020. Compl. Ex. H at 1.

64.    Defendants later billed Plaintiffs an additional $11,250 on invoice 246 for ten days of labor from October 9, 2020 to October 19, 2020, time which had already been included in the services billed on invoice 245.  Compl. Ex. E at 18-19.

65.    The hourly rate shown on Defendants' invoice 246 was not approved by Plaintiffs prior to Defendants' production of the invoice and was never agreed to by the Parties. Compl. Ex. E at 18("till we discuss our rates for labor, I used $500 a day"); Das Aff. ¶ 12.

66.    The hourly rate shown on Defendants' invoice 246 was significantly higher than the Study Report Rate that Defendants agreed to.

67. Defendants' invoice 246 was produced by Defendants as a way to temporarily "get [Plaintiffs] out of hot water for [their] book keeping" because Defendants were unable to account for expenses made to date. Compl. Ex. E at 16-18.

68. Defendants' invoice 246 directly contradicted the agreements between the parties to produce the Study Report for $3,500.

69. Despite repeated requests from Plaintiffs for accounting and receipts, Defendants did not produce an accounting of expenses and costs until mid-December 2020. Attached hereto as Exhibit D is the accounting proffered by Defendants at that time.

70. In their purported accounting, Defendants attributed an additional $32,292.50 in "earned equity" for September 2020. Compl. Ex. D at 2.

71. September 2020 was a month when the principal activity of Defendants in connection with the Yacht was the production of the Study Report.

72. Defendants also attributed an additional $41,945 in "earned equity" for October 2020. Compl. Ex. D at 3.

73. October 2020 was a month when the principal activity of Defendants in connection with the Yacht was the production of the Study Report.

74. In total, Defendants claimed an additional amount of $74,237.50 due for the Study Report.

75. Defendants' claim for an additional amount of $74,237.50 was far in excess of the price of $3,500 agreed upon for the production of the Study Report.

76. The $74,237.50 Defendants have deemed as "equity earned" in September 2020 and October 2020, in excess of the agreed upon price of $3,500 to produce the Study Report, was also fraudulently added to the lien that Defendants have claimed against the Yacht.

14

### *Parties' Joint Venture*

77.     Beginning with their initial contact with Plaintiffs, Defendants' interest in the Yacht involved a joint venture featuring the promotion of Defendants' brand and business ventures. Compl. Ex. A 4:3-8. Compl. Ex. I 19:50-52 ("Im serious about tha [sic] boss Dogg wanting to do a movie shoot.)

78.     Traditional yacht service providers are contracted to perform a set of services in exchange for the payment of agreed upon fees.

79.     Unlike a traditional yacht service provider, Defendants sought to perform work on the Yacht order to thereafter feature the Yacht in the production of Defendants' various music videos, movies, and entertainment offerings. Compl. Ex. A 4:4-8, 15:2-3, 27:27-28; Compl. Ex. I 19:50-52.

80.     Defendants enticed Plaintiffs to work and partner with Defendants by offering free concert tickets and VIP access to Defendant Snoop Dogg's concerts, including his September 2020 show in Austin, Texas. Compl. Ex. I 1:53-55, 2:39-44, 3:46-53, 6:15-16.

81.     Defendants' communications with Plaintiffs included enticements, including pictures from inside Defendant Snoop Dogg's aircraft and from Defendant Snoop Dogg's concerts with statements regarding how committed and "invested" Defendants were to the Yacht and the Restoration Project. Compl. Ex. A 19:21-29, 20:1-21; Compl. Ex. I 3:14-30, 4:7-57, 5:5-55.

82.     Defendants explained that Defendants Snoop Dogg and Doggy Style had a significant and wealthy base of consumers ready, willing and able to hire the Yacht. Compl. Ex. A 27:27-28; Compl. Ex. I 19:50-52.

83.     Defendants enticed Plaintiffs by promising a comprehensive solution for the Yacht: repairs, investments, and a partnership for operations, sales and marketing. Compl. Ex. A 27:1-3.

84.     Defendants projected millions of dollars in revenue for Plaintiffs in the Yacht's first year of operation if Plaintiffs agreed to work with Defendants. Id.

85.     Defendants proposed a management fee payable to Defendants for delivering the revenue they projected to Plaintiffs.

86.     Indeed, when Defendants approached Plaintiffs, Defendants stated that they were offering their expertise and labor in exchange for a partnership and future business relationship between Defendants and Plaintiffs. Das. Aff. ¶ 7; Compl. Ex. A 20:20-21.

87.     Defendants' statement "we're invested in this project with Troca One" refers to Defendants being interested in the described joint venture with Plaintiffs. Id.

88.     Defendants' statement to a third party affiliated with Plaintiffs that "we all need each other right now" regarding the "situation with Troca One" and the "revitalization that we all want to see happen" was Defendants' acknowledgement that Defendants were interested and motivated joint venturers. Compl. Ex. I 49: 15-20.

89.     Defendants acted at all times as partners and joint venturers, not service providers. Compl. Ex. A 56: ,  by encouraging Plaintiffs to move the project along, suggesting Defendants could assist Plaintiffs "foster the movement" of funds, and even offering to "stay on the boat once we have heat."

### Defendants Launch "Soul Boat" Aboard Plaintiffs' Yacht

90.     On October 4, 2020, Defendants published an image of the Yacht alongside an image of Defendant Snoop Dogg and Plaintiffs' "Troca One" trademark and likeness of Plaintiffs' Yacht on the Doggy South Instagram. Compl. Ex. G at 2; Compl. Ex. I. 19: 32-52.

16

91.    Defendants' Instagram post featuring the Yacht on the Doggy South Instagram is shown below:



92.    In the October 4, 2020, Instagram post, Defendants featured an image of Plaintiffs' Yacht and announced the upcoming launch of their "soul boat" stating "where the vibes are good and the people are great."  Compl. Ex. G at 2.

93.    Defendants' publication of Plaintiffs' "Troca One" trademark was without Plaintiffs' prior consent.

94.    Defendants' publication of Plaintiffs' "Troca One" likeness was without Plaintiffs' prior consent.

95.    Defendants' publication of Plaintiffs' "Troca One" image was without Plaintiffs' prior consent.

17

96.    Defendants' interest in the Yacht was actually to take control of it.

97.    In a September 2020 interview with Forbes, Defendant Snoop Dogg described his investment philosophy as, "if it feels good, then I'm all in."

98.    Defendant Doggy Style's social media post regarding the launch of the "soul boat" on the Yacht is consistent with Defendant Snoop Dogg's stated "feels good" investment philosophy.

99.    Defendants were interested in controlling the Yacht, including using the Yacht in music videos and movies that featured Defendant Snoop Dogg and music and videos produced by Defendant Doggy Style. Compl. Ex. A 27:27-28; Compl. Ex. I 19:50-52.

### Defendants Offer to be Fiduciaries in Partnership

100.    Defendants portrayed the joint venture they were offering to Plaintiffs as the exchange of a trusting professional relationship for partnership and equity in the Yacht.

101.    Defendants portrayed themselves as guardians of the Yacht, partners who would protect the Yacht from external enemies. Compl. Ex. I 21:10-12 ("we need to secure it with locksmith and new keys. Take control of the asset and keep [out] unwanted tampering"); Compl. Ex. A 47:5 ("I will have a locksmith out Monday. Secure secure secure").

102.    On September 15, 2020, Defendants advised Plaintiffs that Defendants were Plaintiffs' "quarterbacks." Compl. Ex. A 15:5.

103.    Defendants' offer to be Plaintiffs' "quarterbacks" was an analogy used by Defendants to describe the joint venture; that Plaintiffs and Defendants were on the same team.

104.    A quarterback is a player who directs a team's offensive plays and, by definition, does not share information about plays with people outside the team.

18

105. Despite Defendants' commitments to Plaintiffs, Defendants contacted and shared information pertaining to Defendants' dealings with Plaintiffs with multiple third parties, often disparagingly, and always without Plaintiffs' knowledge.

### *Agreement to Order Engine Parts*

106. In October 2020, Plaintiffs and Defendants agreed that repairs to the engines and critical control and propulsion systems of the Yacht ("Critical Repairs") would be prioritized so that the Yacht could be moved from Boston, Massachusetts to Florida prior to winter. Email from Chad Fuller, PM/FOH Snoop Dogg (Oct. 15, 2020, 14:59 EST)(Compl. Ex. B at 8)("Lets focus finances on parts and repairs critical to full operation for CG inspection for travel.").

107. Plaintiffs made clear to Defendants, and Defendants understood, that notwithstanding their evolving joint venture, Plaintiffs would retain absolute discretion and control of the Restoration Project, including approving scope of work and all expenditures. Email from Chad Fuller, PM/FOH Snoop Dogg (Oct. 12, 2020, 13:30 EST)(Compl. Ex. B at 6)("Can we get the batteries yet."), Email from Chad Fuller, PM/FOH Snoop Dogg (Oct. 25, 2020, 22:53 EST)(Compl. Ex. B at 10)("You tell me how far we can go monetarily.").

108. The parties agreed that Defendants would first propose and then Plaintiffs would have rights to approve all parts necessary for Critical Repairs (the "Parts Agreement").

109. Defendants provided Plaintiffs with various proposals and estimates concerning repairs to the engine of the Yacht. Compl. Ex. E at 1-5, 9-15, 23, 25, 29-30, 33-34.

110. Defendants provided different estimates for often the exact same work to be performed on the Yacht. Compl. Ex. E at 1-5, 9-15, 23, 25, 29-30, 33-34.

111. Understanding the engine was the issue and having agreed with Plaintiffs that engine repairs would be a critical priority, Defendants failed to source, contract, schedule or

otherwise prepare to engage with any engine mechanic to perform the engine repair. Email from Chad Fuller, PM/FOH Snoop Dogg (Oct. 15, 2020, 14:59 EST)(Compl. Ex. B at 8)("Lets focus finances on parts and repairs critical to full operation for CG inspection for travel.").

112.    Notwithstanding their agreement to work only on items agreed and authorized by Plaintiffs, and with the express understanding that only critical engine repairs were authorized, Defendants nonetheless chose to work on the Yacht's Sub Zero freezer drawers, refrigerator, capstan, ladder, passerelle, chiller, sliding door, glendinning, lazarette crane, and appliances, among other items that were not authorized.  Email from Chad Fuller, PM/FOH Snoop Dogg (Oct. 15, 2020, 14:59 EST)(Compl. Ex. B at 8)("Lets focus finances on parts and repairs critical to full operation for CG inspection for travel."); See Notice of Claim of Lien attached hereto as Exhibit J; Summary of Services and Status Prepared by Thomas L. Hejnicki (Jan 3, 2021)(Compl. Ex. J at 6).

### Trust Funds Held by Defendants

113.    To facilitate repairs and the ordering of parts, Plaintiffs and Defendants agreed that Plaintiffs would supply Defendants with immediately available funds to be held in trust by Defendants ("Trust Funds").

114.    Defendants understood that they were required to seek Plaintiffs' approval for all capital expenses to be used in connection with Trust Funds.

115.    Since no labor rate had been agreed to between the Defendants and Plaintiffs, there was no expectations that the Trust Funds would be used to pay Defendants' labor.

116.    Defendants agreed to exchange their labor for equity in a joint venture with Plaintiffs. Compl. Ex. B, at 16; Compl. Ex. E, at 21; Das Aff. ¶ 7.

117.    Defendants sought approval to purchase batteries for the Yacht because they were required to seek approval for all purchased and expenses from Trust Funds. Email from Chad Fuller, PM/FOH Snoop Dogg (Oct. 12, 2020, 13:30 EST)(Compl. Ex. B at 6)("Can we get the batteries yet.").

118.    Defendants' request to purchase $12,000 in batteries was denied by Plaintiffs. Compl. Ex. B at 7.

119.    Trust Funds were to be used for expenditures approved by Plaintiffs ("Approved Expenses"). Id.

120.    In all their dealings with Defendants, Plaintiffs only approved expenditures from the Trust Fund for critical engine components.

121.    Plaintiffs sought Trust Fund accounting from early in the partnership between Plaintiffs and Defendants. Id.

122.    From Trust Funds, $3,500 was used as compensation for the Study Report.

123.    In total, Plaintiffs provided Defendants with Trust Funds of $49,000.

124.    After payment of the Study Report compensation, the balance of remaining Trust Funds was $45,500.

125.    Defendants did not seek nor receive approval from Plaintiffs regarding the purchase of the APC UPS 1500VA UPS Battery Backup using Trust Funds.

126.    Defendants did not seek nor receive approval from Plaintiffs regarding the purchase of the Victron Energy Orion IP20 DC Converter using Trust Funds.

127.    Defendants did not seek nor receive approval from Plaintiffs regarding the purchase of the Micro Lamps Inc T5.5 24/50 using Trust Funds.

128.    Defendants did not seek nor receive approval from Plaintiffs regarding the purchase of the Garmin Voltage Converter Unit S11-01315-30 using Trust Funds.

129.    Defendants did not seek nor receive approval from Plaintiffs regarding the purchase of the Embraco Compressor using Trust Funds.

130.    Defendants did not seek nor receive approval from Plaintiffs regarding the purchase of the Furuno radar parts using Trust Funds.

131.    Defendants did not seek nor receive approval from Plaintiffs regarding the purchase of the Cummins Pump Injection Module using Trust Funds.

132.    Defendants did not seek nor receive approval from Plaintiffs regarding the purchase of the Fluke 1520 MegOhmMeter Tester using Trust Funds.

133.    Defendants did not seek nor receive approval from Plaintiffs regarding the purchase of the Fluke 80pk-8 Temperature Probe using Trust Funds.

134.    Defendants did not seek nor receive approval from Plaintiffs regarding the purchase of the Brady BMP61 Pro Label Maker using Trust Funds.

135.    Defendants did not seek nor receive approval from Plaintiffs regarding the purchase of the Milwaukee M12 Cordless Automotive Ratchet Kit using Trust Funds.

136.    The wide gap between proposals for Critical Repairs, Approved Expenses, and Defendants' discretionary purchases was discovered upon Plaintiffs own investigation after Defendants refused to provide Trust Fund accounting.

### *Defendants' Failure to Perform*

137.    Defendants presented proposals for Critical Repairs under Parts Agreement to induce Plaintiffs to increase the amount deposited by Plaintiffs into Trust Funds. Compl. Ex. E at 1-5, 9-15, 23, 25, 29-30, 33-34.

138.   Despite providing estimates for parts required for Critical Repairs, Defendants failed to order those parts approved as Approved Expenses.

139.   Instead, Defendants made unauthorized purchases using Trust Funds.

140.   Upon information and belief, Defendants did not provide Plaintiffs the requested accounting because such accounting would notify Plaintiffs early of Defendants' breach, failures, conversion of assets and misappropriation of Trust Funds.

141.   Understanding the engine was the most important and critical issue, Defendants failed to source, schedule, contract, or even negotiate with any engine mechanic.

142.   Defendants had knowledge of the close timelines and failed to timely fulfill commitments.

143.   Despite their agreement to do so, Defendants breached their fiduciary duty by failing to perform standard and routine winter maintenance on the Yacht to avoid damage occurring in the harsh winter months in Boston, which resulted in pipe bursts and significant damage to the Yacht. Compl. Ex. A 78:24-26.

144.   Defendants understood that their role was to protect and preserve the Yacht and failed to take minimum steps to ensure protective steps were taken.

### *Defendants' Fraudulent Billing*

145.   Defendants represented that they were ordering various parts that were necessary to repair the engine. Compl. Ex. A 23:15-22, 38:22-28, 56:8-16, 66:3-5, 67:1, 70:6.

146.   Defendants represented that they were adhering to the agreement, by requesting authorization for various part orders as they determined what parts they claimed were necessary.

147.   Plaintiff approved various part orders and authorized Defendants to disperse Trust Funds to acquire specific parts.

148. Defendants represented to Plaintiffs that they were using Trust Funds to order the approved parts, and that they were stockpiling parts that they claimed were required to make Critical Repairs, including repairing the Yacht's engine.

149. When Plaintiffs requested a detailing accounting after depositing Trust Funds of $49,000, which were spent by Defendants, Defendants failed to produce the requested accounting.

150. Upon further inquiry by Plaintiffs as to why Defendants failed to produce the accounting requested, Defendants expressly refused to provide Plaintiffs with the accounting for Trust Funds.

151. Subsequently, rather than provide the requested accounting pursuant to the agreement, Defendants instead served a bill to Plaintiffs in the amount of $118,138.91 in monies owed. Compl. Ex. E at 38.

152. Plaintiffs, in good faith, requested all detailed accounting and offered to negotiate with Defendants to resolve the matter if they provided justification for their claims.

153. Defendants' invoices were inaccurate, unsubstantiated, and fraudulent. For example, Defendants' Invoice # 1039, dated December 1, 2020, shows "labor" for Thomas Hejnicki on two line items, dated November 8, 2020 for 14 units at $7,000, and another on November 26, 2020 for 7 units at $3,500 "through December 4, 2020" (a total billing for Defendant Thomas Hejnicki of $10,500 through December 4, 2020). Soon after issuing their previous invoice, Defendants inflated Defendant Thomas Hejnicki's time from a total of $10,500 on Invoice #1039 to a grand total of $51,700 on Invoice # 1040 (this time through December 6, 2020), an impressive but inexplicable five-fold increase. Compl. Ex. E, at 36-38.

154. Defendant Chad Fuller's rebilled labor charges were equally meteoric, growing from a total of $7,000 on Invoice # 1039 to a total of $54,230 on Invoice # 1040. Supra at 36-38.

24

Defendants' billings and performance under the agreements bear little resemblance to reality or reason.

155. Defendants offered Plaintiffs nothing to support any of these billings beyond a veiled fraudulent representation that if Plaintiffs were to continue inquiring where the money had been spent, their billings would continue to increase in retaliation.

156. Despite billing TY One on October 5, 2020 invoice 245 for the Study Report, Defendants actually did not deliver the completed Study Report until October 26, 2020; and used much of the time during Defendants' only October 2020 visit to the Yacht, which was from October 9, 2020 to October 19, 2020 to post on social media, plan their joint venture with Plaintiffs, and further their fraudulent plans.

157. The Study Report issued by Defendant on October 26, 2020 specifically lists Defendants' review period for the Study Report from September 11, 2020 to October 19, 2020.

158. Defendants proceeded to then intentionally and fraudulently bill TY One an additional $11,250 for the following invoice 246, for ten days of labor from October 9, 2020 to October 19, 2020

159. Despite their agreement to produce the Study Report for $3,500 in cash and a promise from TY One of consideration for future work and potential partnership, Defendants subsequently charged Plaintiffs $77,737.50 in cash and "earned equity" for the Study Report after Plaintiffs request for detailed accountancy pursuant to the agreement.

160. Indeed, Defendants billed Plaintiffs an "earned equity" fee of $32,292.50 in September 2020 when the only engagement between Defendants and Plaintiffs was the production of the Study Report. Email from Thomas Hejnicki, Acoustic Allies (Dec. 16, 2020, 12:16 EST)(Compl. Ex. D at 1-5).

161.    Defendants attributed an additional $41,945 in "earned equity" for October 2020 when the principal activity of Defendants in connection with the Yacht in October 2020 was the production of the Study Report. Email from Thomas Hejnicki, Acoustic Allies (Dec. 16, 2020, 12:16 EST)(Compl. Ex. D at 1-5).

162.    Besides representing a duplicate bill, Invoice # 246, upon which Defendants rely to achieve their fanciful and spectacular claim of a debt owed Defendants of $118,138.91, Defendants also unilaterally selected a labor rate for services that was never discussed, let alone agreed to or approved by Plaintiffs. Compl. Ex. E at 18("till we discuss our rates for labor, I used $500 a day").

### Defendants' Offer to Defraud MTB

163.    In addition to their fraudulent billing of Plaintiffs, Defendants proposed to bill and seek damages from MTB for damages and then "negotiate independently on the back end" with Plaintiffs. Compl. Ex. A 24:15-20.

164.    Defendants' proposal to "negotiate independently on the back end" was Defendants' invitation to bill MTB one amount and collect a different, presumably lower amount from Plaintiffs.

165.    Defendants' proposal to "negotiate independently on the back end" was Defendants' offer to commit fraud to gain equity in the Yacht.

166.    Defendants' interest in the Yacht was to gain equity in the Yacht through whatever means necessary.

167.    Plaintiffs refused to conspire with Defendants to defraud MTB.

26

***Defendants' Purposeful Tortious Conduct, Interference with
Plaintiffs' Contractual Relations and Defamation***

168.    Throughout their interactions, including after the completion of the Study Report, Plaintiffs and Defendants agreed that Defendants would only make repairs, order parts, and make improvements to the Yacht once explicitly authorized and funded by Plaintiffs.

169.    Defendants offered to provide guidance in Plaintiffs' dealings with Plaintiffs' lender, MTB. Compl. Ex. A 21:14-18, 24:15-20.

170.    While Defendants had agreed to Plaintiffs' conditions and absolute discretion to do (a) some work, (b) the complete project, or (c) no work at all towards the Restoration Project, Defendants decided to nonetheless violate their agreements with Plaintiffs and intentionally interfere with Plaintiffs' contractual relationships with third parties to tortiously wrestle control of both the Restoration Project and, ultimately, ownership of the Yacht from Plaintiffs.

171.    By December 2, 2020, Plaintiffs had realized that Defendants' fraudulent accounting and billing practices and failure to provide any accounting for Trust Funds provided by Plaintiffs would not allow the Restoration Project to continue in 2020.

172.    Upon that realization, Plaintiffs asked Defendants to prepare to winterize the Yacht and postpone major additional work until the Spring of 2021.  Compl. Ex. A 78:22-26.

173.    On December 2, 2020 Defendant Fuller sought help regarding his misrepresentations to Plaintiffs and asked a third party, "you have time for a call[?] I think I inadvertently pissed Beej off. Need help." Compl. Ex. I. 54:25-27.

174.    Defendants knew they had failed to provide Plaintiffs with complete and accurate accounting of the Trust Funds and were afraid that Plaintiffs had discovered Defendants' fraud and were angry as a result.

175.    On December 4, 2020, days after providing guidance to Plaintiffs regarding Plaintiffs' dealings with MTB, Defendants contacted MTB directly to negotiate a role in the Restoration Project, deceptively bypassing Plaintiffs without prior authorization or notice. Attached hereto as Exhibit C is Defendants' email to MTB. See Compl. Ex. C at 1.

176.    Prior to their joint venture with Plaintiffs, Defendants had no relationship with MTB.

177.    Defendants only learned of MTB and Plaintiffs' senior level contacts at MTB through their access to privileged information gained from their joint venture with Plaintiffs.

178.    Defendants' email to MTB was open and uncontroverted interference with Plaintiffs' contractual relations and a forced bypass of a borrower's rights to its asset and loan. Email from Chad Fuller, PM/FOH Snoop Dogg to Matthew Snyder, Customer Asset Management / Remarketing Specialist, M&T Bank (Dec. 4, 2020, 10:54 EST)(Compl. Ex. C).

179.    Defendants' communications with MTB, including its December 4, 2020 email, were replete with falsehoods and fraudulent misrepresentations. Id.

180.    In their email, Defendants claim that the Yacht is confronting a "hard deadline of December with the Marina." No such deadline existed. The marina in Boston remained open and space for the Yacht through the winter was always available. Id.

181.    To circumvent Plaintiffs' interests and rights, Defendants suggested to MTB that they relocate Plaintiffs' asset, without Plaintiffs' consent or notice, to the Hutchinson Island Causeway Cove Marina, located near Defendants in Florida. Id.

182.    Defendants never notified MTB that they had previously offered to "negotiate independently on the back end" with Plaintiffs the amounts they billed to MTB.

28

183.   Defendants' unsolicited and tortious outreach to MTB was not the only time Defendants attempted to interfere with Plaintiffs' contractual relationships and defame Plaintiffs in an effort to advance Defendants' own interests.

184.   Utilizing the social media site LinkedIn, Defendants contacted unrelated third parties to defame Plaintiffs. In one such communication, Defendants wrote to a third party and asked if they were connected to the Yacht. Compl. Ex. F at 11. When asked why they were asking, Defendants responded "we tried to help him save the boat from repossession. Ended up not getting a true story and always coming up short on estimated funds needed. Felt like we got jerked around." Das. Aff. ¶ 13-14.

185.   Defendants tortiously interfered with Plaintiffs' contractual relationships with third parties throughout their interactions with Plaintiffs and the Yacht.

186.   Defendants have intentionally committed fraud in their dealings with Plaintiffs and actively attempted to take hostile control of the Yacht through conducting unfair and deceptive trade practices.

### *Defendants Ignored Plaintiffs' Absolute Discretion Regarding Restoration Project*

187.   Plaintiffs made clear to Defendants that capital available for deployment on the Restoration Project was uncertain and limited until the Yacht was refinanced or another capital event was achieved. As a result, no commitments could be made by Plaintiffs regarding the scope of work or approved renovations. Defendants understood and agreed to these conditions. Compl. Ex. A 56:15-16.

188.   As part of Plaintiffs' interest in carefully planning capital expenses for the Yacht after thorough deliberation, review and approval in each instance and consistent with its agreement with MTB, Plaintiffs made clear statements to Defendants that Plaintiffs would insist

on its absolute discretion in prior approval and payment for services rendered and parts acquired on its behalf as part of the Restoration Project.

189.    As a result, the record reflects several requests for permission to incur expenses by Defendants, which were explicitly rejected by Plaintiffs, in many instances because Defendants had failed to meet even the most minimal accounting requirements for seeking reimbursements or authorizations. Compl. Ex. A 78:22-24.

190.    Plaintiffs never authorized Defendants to work on credit or incur expenses on its behalf.  Neither Plaintiffs nor Defendants entered into any contracts or agreements authorizing Defendants to incur expenses without prior authorization. The understanding that expenses were to be incurred by Defendants only after explicit approval from Plaintiffs and in furtherance of the most critical of repairs was acknowledged and understood by Defendants.  Email from Chad Fuller, PM/FOH Snoop Dogg (Oct. 15, 2020, 14:59 EST)(Compl. Ex. B at 8)("Lets focus finances on parts and repairs critical to full operation for CG inspection for travel."). Email from Chad Fuller, PM/FOH Snoop Dogg (Oct. 12, 2020, 13:30 EST)(Compl. Ex. B at 6)("Can we get the batteries yet."), Email from Chad Fuller, PM/FOH Snoop Dogg (Oct. 25, 2020, 22:53 EST)(Compl. Ex. B at 10)("You tell me how far we can go monetarily.").

191.    Defendants sought, in their Lien, to charge labor for items such as the passerelle, which was never approved by Plaintiffs, and by Defendants own acknowledgement is "noncritical to ships operation." Compl. Ex. J at 6.

192.    The record demonstrates that all discretion for work authorized, parts ordered, and expenses incurred always remained with Plaintiffs.  That notwithstanding, Defendants are now seeking to enforce a Lien that lacks any basis in contract or maritime law.

193. Defendants proposed an equity partnership to induce Plaintiffs to provide them access to the Yacht and once granted, unilaterally asserted a relationship that never existed and was never agreed upon.

### *Sloppy Accounting and Intentional Obfuscation*

194. At the outset of the relationship between Defendants and Plaintiffs to induce a working relationship, Defendants promised to be "completely transparent with invoices for parts and expenses." Compl. Ex. A 24:16-17.

195. The value of the Yacht was dependent upon accurate accounting and thorough documentation of work performed, parts supplied, diagnostic intervals, maintenance records, which Defendants understood.

196. Defendants failed to provide documentation for the work performed that would warrant ANY expenditure to restore the Yacht, as the value spent to restore the Yacht would not be adequately returned.

### *Defendants Conversion of Remanufactured Parts*

197. Defendants offered to retrieve parts from Reliable Diesel Service Inc. ("Reliable") of Billerica, MA, which had remanufactured essential engine components at its shop outside of Boston.

198. Defendants offered to retrieve these parts and deliver them to the Yacht, which Plaintiffs authorized.

199. Plaintiffs paid in excess of $20,000 to Reliable for the remanufacture of these parts, the last $5,000 of which Defendants delivered to Reliable.

200. Defendants appeared in person at Reliable's facility and took possession of the parts.

31

201.    Defendants misrepresented to the Plaintiff that the parts were delivered to the Yacht.

202.    Defendants never delivered the parts to the Yacht.

203.    Defendants retained possession of the parts without the consent of Plaintiffs.

204.    Defendants have stolen and converted approximately $40,000 worth of critical engine parts from Plaintiffs.

205.    Plaintiffs only realized that the parts were never delivered after inspection of the Yacht, subsequent to the deterioration of their relationship with Defendants.

### *Defendants Committed Perjury in Filing a Lien Against the Yacht*

206.    Defendants filed a Notice of Maritime Lien (also entitled Notice of Claim of Lien)(hereinafter the "Lien") dated January 27, 2021 upon various parties, including the United States Coast Guard National Vessel Documentation Center, MTB, and TY Holdings LLC [sic]. Compl. Ex. J.

207.    The Lien was signed by Defendant Fuller "under penalty of perjury." Compl. Ex. J at 2.

208.    Defendants Fuller, Hejnicki, Black Widow and Acoustic Allies committed perjury in the signing and filing of the Lien because they knew the information contained in the Lien they filed was false.

209.    The entire $118,138.91 claimed on the Lien is attributable to sweat equity supposedly earned by Defendants.

210.    Defendants applied payments of $49,000 from Plaintiffs' Trust Fund towards amounts they claimed were due. This fact alone is fatal to Defendant's claims and Lien because of the following four reasons: (1) There was no general or broad agreement in place between

32

Defendants and Plaintiffs for work to be performed on the Yacht. (2) Plaintiffs explicitly rejected the performance of any work beyond work that it specifically approved in writing, which is clear because of the explicit requests for approval received from Defendants for work to be performed on the Yacht. Email from Chad Fuller, PM/FOH Snoop Dogg (Oct. 12, 2020, 13:30 EST)(Compl. Ex. B at 6). (3) Defendants themselves agreed that no labor agreement existed between the parties, including agreement on labor rates. Email from Chad Fuller, PM/FOH Snoop Dogg (Oct. 30, 2020, 17:14 EST)(Compl. Ex. E at 20-21)(acknowledging that "funds being advanced are primarily for parts and expenses");Compl. Ex. E at 18(acknowledgment that labor rates had neither been discussed or approved: "till we discuss our rates for labor"). (4) The "Summary of Services and Status" attached to the Lien was provided by Defendant Hejnicki to Plaintiffs. Defendant Hejnicki's spreadsheet, contained in an email to Plaintiffs on December 16, 2020 acknowledged that a majority of the work performed by Defendants in the form of labor was deemed equity by Defendants, not cash payable. Email from Thomas Hejnicki, Acoustic Allies (Dec. 16, 2020, 12:16 EST)(Compl. Ex. D at 1-5)(acknowledgement of an "equity earned" amount of $87,894.77 and a claimed balance due of $31,150.37).

### *Defendants Have Converted Plaintiffs' Other Property*

211.    Despite assurances that items purchased and paid for by Plaintiffs remain at the Yacht, Defendants have converted and taken property belonging to Plaintiffs and removed them from the Yacht.

### *Defendants Have Filed a False Police Report*

212.    Despite their own conversion of Plaintiffs' property, Defendants falsely filed a police report with the Boston Police Department on April 2, 2021 alleging that Plaintiffs and their representatives removed Defendants' property from the Yacht without Defendants' consent.

213. Defendant's "Final Notice to the ownership representatives of Troca One" dated April 1, 2021 lists Defendants' purported "personal belongings" but includes property actually owned by Plaintiffs and purchased using Plaintiffs' own Trust Funds. Email from Chad Fuller, PM/FOH Snoop Dogg (Apr. 1, 2021, 17:05 EST)(Compl. Ex. B at 16)(listing a "Fluke Megohm Meter"); Email from Thomas Hejnicki, Acoustic Allies (Jan. 4, 2021, 2:17 EST)(Compl. Ex. E at 39-40)(providing partial accounting of Trust Fund purchases including a "Fluke Megohm Meter" purchased and delivered to Troca One).

214. Defendants then solicited the Boston Police Department to assist them in converting Plaintiffs' property.

215. Defendants did not advise Plaintiffs or the Charlestown Marina to safeguard their actual belongings, which they claim they had left on the Yacht for "over three months."

216. Defendants abandoned a project after their fraudulent billing practices were exposed and, now file a police report to malign and defame Plaintiffs.

### Development of Plaintiffs' Troca Brand

217. From 2017 to the present, Plaintiffs have invested over a million dollars on Yacht renovations, upgrades, improvements, and repairs and enhancing the Yacht's likeness and profile.

218. Troca Holdings developed and exclusively owns rights in certain trademarks, including, without limitation, the Troca One mark (the "Troca Brands").

219. The transformation from the vessel purchased by Plaintiffs in May 2017 to the Yacht required sustained brand investment, thoughtful development and aggressive marketing by Plaintiffs to create and promote the Yacht as a material part of Plaintiffs' intellectual property and marks representing high quality entertainment and hospitality in a friendly and stylish environment.

220.   Plaintiffs' interstate and international advertising of the Yacht prominently featured its affiliation with Troca Brands.

221.   The Yacht and Troca Brands have received significant unsolicited positive coverage in various media.

222.   As a result of the widespread, long, continuous, and exclusive use of Troca Brands, the purchasing public has come to know and recognize them as identifying Plaintiffs' goods and services.

223.   As a result of the widespread, long, continuous, and exclusive use of Troca Brands, Plaintiffs own valid and subsisting rights to Troca Brands.

224.   Plaintiffs have expended substantial time, money, and resources marketing, advertising, and promoting the goods and services provided under Troca Brands.

225.   Defendants marketed their own businesses using Troca Brands without authorization from Plaintiffs. posted various images of the Yacht, including Troca Brands, to enhance their own brand and image and while diminishing Plaintiffs' Troca Brands.

## COUNT I
### Slander of Title

226.   Plaintiffs reincorporate by reference the preceding paragraphs of the Complaint as though fully set forth herein.

227.   Under penalty of perjury, Defendants filed a Notice of Claim of Lien with the United States Coast Guard Office of Vessel Documentation.

228.   The statements contained in Defendants' Notice of Claim of Lien are false.

229.   Defendants' actions in filing a fraudulent Notice of Claim of Lien were intended to cause Plaintiffs heavy pecuniary losses and have indeed caused such.

230.    Defendants knew the statements contained in their Notice of Claim of Lien were false and have acted in a manner that shows reckless disregard for the truth.

231.    Defendants' intentional and malicious acts diminished and devalued Plaintiffs' primary asset, title to the Yacht.

232.    Defendants predicate their "maritime lien" on false statements, fabricated billings, concocted debts, and a contrived yet infeasible representation to be both "joint venturers" and "strangers to the vessel".

233.    As a result of Defendants' fraudulent slander of title, Plaintiffs have suffered significant damage. Plaintiffs were in sensitive negotiations with MTB to achieve a settlement of certain claims between them. Since Defendants' lien filing, Plaintiffs' negotiations with MTB have been undermined, Plaintiffs' negotiated settlement with MTB, achieved at great expense, has been imperiled, and Plaintiffs' access to their Yacht restricted.

234.    Furthermore, Plaintiffs were marketing the Yacht for sale and investment throughout their dealings with Defendants. By filing the lien, Defendants have destroyed Plaintiffs' continued operations, inhibited their ability to settle contractual obligations with MTB, and rendered the Yacht "unmarketable."

235.    Plaintiffs have suffered damages resulting from Defendants' actions.

## COUNT II
## Breach of Contract

236.    Plaintiffs reincorporate by reference the preceding paragraphs of the Complaint as though fully set forth herein.

237.    The agreements between the parties were consummate with Plaintiffs' goal to repair the Yacht, and Defendants promise to perform work within the scope of their initial estimate to repair the Yacht for Plaintiffs and be compensated within the scope of said estimate.

36

238.    Plaintiffs and Defendants agreed, prior to the commencement of any services being provided by Defendants, that all billable parts and services must be brought to Plaintiffs for prior approval before such parts were purchased or services commenced.

*Contract to Provide Study Report*

239.    Plaintiffs and Defendants agreed, prior to the commencement of any work by Defendants to produce the Study Report, that the maximum fee Plaintiffs would pay would not exceed Three-Thousand Five-Hundred Dollars ($3,500).

240.    Defendants initially billed Plaintiffs $3,500.00 to produce the Study Report, pursuant to their agreement.

241.    Defendants labeled a "discount" on their initial invoice to Plaintiffs in the amount of $21,340.00, reflecting the agreement between the parties that the fee for producing the Study Report shall not exceed $3,500.

242.    Defendants subsequently billed Plaintiffs an additional $85,487.00 for production of the Study Report.

243.    The dates during which much of Defendants' claim monies are owed, coincide with the time period whereby the only agreement between the parties was for the $3,500 compensation for the Study Report, prior to any subsequent agreements, including the Parts Agreement.

*Parts Agreement*

244.    Plaintiffs and Defendants agreed, prior to Defendants ordering any parts for the Yacht, that Plaintiffs must approve all part orders for the Yacht prior to Defendants ordering said parts and billing Plaintiffs for the same.

37

245. Plaintiffs and Defendants agreed, prior to Defendants hiring any contractors to perform work on the Yacht, that all such contracts for outside labor must be approved by Plaintiffs prior to any contractor performing work on the Yacht.

246. Defendants agreed to hold Trust Funds and request authorization and consent from Plaintiffs before any expenditure on parts or services to acquire parts.

247. Defendants agreed to maintain meticulous records and provide transparency for every expenditure of the Trust Funds, including retention and preservation of receipts, orders, invoices, and all such documentation of accounting.

248. Upon Plaintiffs request to Defendants to provide detailed accounting of the expenditures, Defendants breached their agreement by failing to provide Plaintiffs the requested accounting.

249. Defendants refused to provide even basic accounting to Plaintiffs detailing their expenditures of Plaintiffs' funds, in clear breach of their agreement.

250. Defendants subsequently billed Plaintiffs exorbitant amounts for parts ordered that Plaintiffs had no knowledge were ordered, and never approved, in breach of their agreements.

251. Defendants subsequently billed Plaintiffs for unapproved and unauthorized "labor" that was never agreed to by Plaintiffs, in breach of their agreement.

*Failure to Perform*

252. Plaintiffs later found that Defendants breach the agreements by either failing to order, failing to acquire, and/or failing to deliver various parts to the Yacht that Plaintiffs approved and paid for pursuant to their agreements.

38

253.   Plaintiffs later found that certain services that were approved and paid for, which Defendants represented were conducted, were in fact never conducted, which constitutes a further breach of their agreements.

254.   Plaintiffs later found that certain repair services that were approved and paid for, which Defendants represented were conducted properly and in full compliance with the standards of industry, were in fact not conducted properly, and did not meet the standards of the industry, in clear breach of their agreement.

255.   Defendants breached their agreements with Plaintiffs and proceeded thereafter to attempt to veil their various breaches, of which Plaintiffs have now become aware.

256.   Defendants retaliated against Plaintiffs in clear violation of the agreements between the parties in a brazen attempt to defend against and circumvent liability due to their various breaches of the contracts as detailed herein.

257.   As a result of Defendants breaches of said agreements between the parties, Plaintiffs have suffered significant actual damages.

## COUNT III
## Breach of the Covenant of Good Faith and Fair Dealings

258.   Plaintiffs reincorporate by reference the preceding paragraphs of the Complaint as though fully set forth herein.

259.   Defendants have, throughout their dealings with Plaintiffs, continuously violated their implied covenant of good faith and fair dealings.

260.   Defendants misrepresented to Plaintiffs that they were providing benefit to the Yacht through each proposed service that was approved and paid for by Plaintiffs.

261. Defendants intentionally breached their agreements with Plaintiffs, in bad faith to elicit funds from Plaintiffs under the guise of service in compliance with the agreements between the parties.

262. Defendants damaged the Yacht significantly by their actions, in direct opposition to the purpose and the agreements and understandings between the parties.

263. Defendants caused damage to the Yacht that did not exist prior to their entry thereon.

264. Defendants fraudulently sought approvals for parts and services which were not implemented and/or conducted.

265. Defendants fraudulently and deceptively procured Trust Funds, and misappropriated such funds, which were held by Defendants in trust, through false proposals and representations, which Plaintiffs, in good faith, authorized and approved.

266. Defendants entered into the agreements with Plaintiffs in bad faith, without the skill and capability of facilitating the repairs to the Yacht in accordance with the scope of their estimate to elicit funds from Plaintiffs through fraudulent billings.

267. Defendants entered into the agreements with Plaintiffs promising detailed accounting throughout, which Defendants failed to provide thus exhibiting Defendants' bad faith intentions from the inception of their dealings with Plaintiffs.

268. Defendants proceeded to retaliate against Plaintiffs for requesting accounting by fraudulently billing Plaintiffs for items never contracted between the parties, in an attempt to mask their liability from breaching the agreements.

269. Defendants' breach of the covenants of good faith and fair dealings have caused Plaintiffs significant loss.

## COUNT IV
### Conversion

270. Plaintiffs reincorporate by reference the preceding paragraphs of the Complaint as though fully set forth herein.

271. Plaintiffs own the Yacht and all mechanical components, fixtures, and components of the Yacht.

272. Plaintiffs own various assets of significant value that were stored on the Yacht.

273. Defendants, while on the Yacht, removed crucial mechanical parts and components from the Yacht's engine and propulsion system.

274. Defendants removed crucial mechanical parts and components from the Yacht and retained possession of such parts and components without Plaintiffs' consent or knowledge.

275. Defendants acquired Plaintiffs' remanufactured engine components from Reliable in order to deliver them to the Yacht.

276. Defendants never delivered Plaintiffs' engine components to the Yacht and continue to retain possession of these components without the consent or authority of Plaintiffs.

277. Defendants also took various assets from the Yacht, including manuals, parts, components, and tools without Plaintiff's knowledge or consent.

278. Defendants converted and stole assets they purchased using Trust Funds. Defendants claim ownership over property actually owned by Plaintiffs and purchased by Defendants using Plaintiffs' own Trust Funds.

279. Defendants retain possession of the assets without consent of Plaintiffs.

280. As a result, Plaintiffs have suffered damages at the hands of Defendants.

**COUNT V**
**Violation of Massachusetts General Laws Chapter 93A**

281.   Plaintiffs reincorporate by reference the preceding paragraphs of the Complaint as though fully set forth herein.

282.   Defendants fraudulently and deceptively billed Plaintiffs for work that was never agreed to between the parties.

283.   Defendants fraudulently and deceptively billed Plaintiffs for work that was never conducted.

284.   Defendants fraudulently and deceptively billed Plaintiffs for work at a rate drastically higher than their agreements.

285.   Defendants fraudulently and deceptively represented that they were providing service to the Yacht that was never conducted.

286.   Defendants fraudulently and deceptively represented to Plaintiffs that they were capable of repairing the Yacht.

287.   Defendants fraudulently and deceptively represented to Plaintiffs that they would improve the Yacht when in fact their actions did the opposite.

288.   Defendants fraudulently and deceptively represented to Plaintiffs that they were improving the Yacht and helping Plaintiffs when in fact they damaged both.

289.   Defendants fraudulently and deceptively agreed to bill Plaintiffs a fixed price of $3,500 for the Study Report then subsequently billed Plaintiffs an additional $85,487.50 for the Study Report.

290.   Defendants fraudulently produced an estimate, which they had no intention of adhering to, and which they produced for Plaintiffs for them to rely upon to solicit their business initially.

291.    Defendants fraudulently and deceptively billed Plaintiffs for unapproved parts and labor which Plaintiffs never agreed to nor never notified of.

292.    After Plaintiffs reasonably requested a detailed accounting of Defendants' various expenditures of Trust Funds, Defendants proceeded to inexplicably, and without any justification, increase their bills astronomically.

293.    Defendants increased their bill in retaliation for Plaintiffs' reasonable requests for Trust Fund accounting.

294.    Defendants produced fraudulent estimates, relied upon by Plaintiffs, so that they could later elicit additional funds from Plaintiffs through threat of lien.

295.    As a result, Plaintiffs have suffered damages at the hands of Defendants.

296.    For the reasons explained above, Defendants knowingly and willfully committed unfair and deceptive acts in trade or commerce to the detriment of Plaintiffs and have violated Chapter 93A of the Massachusetts General Laws, Mass. Gen. Law ch. 93A §§ 2 and 11.

297.    As a result, Plaintiffs have suffered damages.

**COUNT VI**
**Unjust Enrichment**

298.    Plaintiffs reincorporate by reference the preceding paragraphs of the Complaint as though fully set forth herein.

299.    Plaintiffs provided Trust Funds for parts that Defendants represented would improve the Yacht.

300.    Plaintiffs provided Trust Funds for parts that Plaintiffs were led to believe would be implemented into the Yacht.

301.    Defendants did not implement parts into the Yacht that were paid for by Plaintiffs.

43

302. Plaintiffs paid Defendants for parts which Plaintiffs never received from Defendants.

303. Plaintiffs compensated Defendants for services that Defendants represented would improve the Yacht and bring it closer to working order.

304. Defendants did not perform the services that Defendants represented they would perform.

305. Defendants did not perform repair services that improved the Yacht or bring the Yacht closer to working order.

306. Defendants increased damage to the Yacht and brought the Yacht to a heightened degree of disrepair.

### COUNT VII
### Intentional Misrepresentation

307. Plaintiffs reincorporate by reference the preceding paragraphs of the Complaint as though fully set forth herein.

308. Defendants represented to Plaintiffs that they could repair the Yacht back to full working order.

309. Defendants represented to Plaintiffs that the Study Report would cost them a maximum of $3,500.

310. Defendants represented to Plaintiffs that they would not order any parts without prior approval and consent of Plaintiffs.

311. Defendants represented to Plaintiffs that they would not commence any services without prior approval and consent of Plaintiffs.

312. Defendants represented to Plaintiffs that they would bill and receive payment for parts and services prior to commencing with part orders and services.

44

313. Defendants represented to Plaintiffs that they would perform all services in a professional workmanlike manner, consistent with the standards of the industry.

314. Defendants represented to Plaintiffs that they would not bill Plaintiffs for unauthorized parts and services.

315. Defendants represented to Plaintiffs that they would waive certain fees that were material to the agreements between the parties.

316. Defendants represented that they ordered various parts that Plaintiffs paid for and approved.

317. Defendants represented that they retrieved the remanufactured parts from Reliable and delivered them to the Yacht.

318. Defendants represented that they would provide Plaintiff with detailed accounting of all payments tendered.

319. Defendants represented that their work would remain within the scope of amounts agreed between them and the Plaintiffs.

320. Defendant intentionally made each representation, as detailed in the enumerations 308 through 319 herein, with knowledge that each representation was false.

321. Defendants intentionally made each representation, as detailed in enumerations 308 through 319 herein, to induce Plaintiffs to act in reliance on their misrepresentations to elicit funds from Plaintiffs.

322. In all aforementioned enumerations 308 through 319 herein, Plaintiffs reasonably relied upon the misrepresentations made by Defendants and incurred significant damages as a direct result of their reliance on the Defendant's intentional misrepresentations.

## COUNT VIII
### Negligent Misrepresentation

323. Plaintiffs reincorporate by reference the preceding paragraphs of the Complaint as though fully set forth herein.

324. Defendants represented to Plaintiffs that they were capable of returning the Yacht back to full working order.

325. Defendants represented to Plaintiffs that the Study Report would cost them a maximum of $3,500.

326. Defendants represented to Plaintiffs that they would not order any parts without prior approval and consent of Plaintiffs.

327. Defendants represented to Plaintiffs that they would not commence any services without prior approval and consent of Plaintiffs.

328. Defendants represented to Plaintiffs that they would bill and receive payment for parts and services prior to commencing with part orders and services.

329. Defendants represented to Plaintiffs that they would perform all services in a professional workmanlike manner, consistent with the standards of the industry.

330. Defendants represented to Plaintiffs that they would not bill Plaintiffs for unauthorized parts and services.

331. Defendants represented to Plaintiffs that they would waive certain fees that were material to the agreements between the parties.

332. Defendants represented that they ordered various parts that Plaintiffs paid for and approved.

333. Defendants represented that they retrieved the refurbished parts from Reliable and delivered to the Yacht.

334.    Defendants represented that they would provide Plaintiff with detailed and timely accounting of all payments tendered.

335.    Defendants negligently made each representation, as detailed in the enumerations 324 through 334 herein, with disregard for the truth or falsity of the representations.

336.    Defendants were, in fact, incapable of fulfilling the representations detailed in enumerations 324 through 334 herein,

337.    Defendants negligently made each representation, as detailed in enumerations 324 through 334 herein, to induce Plaintiffs to act in reliance on their misrepresentations to elicit funds from Plaintiffs.

338.    In all aforementioned enumerations 324 through 334 herein, Plaintiffs reasonably relied upon the misrepresentations made by Defendants and incurred significant damages as a direct result of their reliance on the Defendant's misrepresentations.

## COUNT IX
## Defamation

339.    Plaintiffs reincorporate by reference the preceding paragraphs of the Complaint as though fully set forth herein.

340.    Defendants launched a smear campaign against Plaintiffs on social media, seeking former business associates, partners, and colleagues in an attempt to destroy Plaintiffs' reputation.

341.    Defendants alleged that Plaintiffs are dishonest.

342.    Defendants alleged that Plaintiffs committed fraud.

343.    Defendants alleged that Plaintiffs do not pay their bills.

344.    Defendants sent such false representations to MTB in an attempt to disrupt and harm the Plaintiffs' dealings with MTB and further harm Plaintiffs' reputation within the finance and investment community.

345. Defendants sent such false representations to the Charlestown Marina, where the Yacht is docked to disrupt and harm Plaintiffs' dealings with the Marina and harm Plaintiffs' reputation within the community surrounding the physical area where the Yacht is physically located.

346. Defendants sent such false representations to James Foster, whom Defendants found after stalking Plaintiffs' LinkedIn page. James Foster had business dealings with Plaintiffs years ago but has not been a resident of the United States since 2017.

347. Defendants filed a false police report with the Boston Police Department despite knowledge of the falsity of their accusations.

348. Defendants made such statements intentionally, with knowledge of their falsity, in an attempt to harm Plaintiffs' reputation.

349. As a result of Defendants' intentional acts, Plaintiffs have suffered significant damages.

## COUNT X
### Tortious Interference

350. Plaintiffs reincorporate by reference the preceding paragraphs of the Complaint as though fully set forth herein.

351. Defendants have contacted individuals and entities involved in business activity with Plaintiffs to interfere with Plaintiffs' business.

352. Defendant has launched a smear campaign against Plaintiffs, stalking Plaintiffs' social media and contacting Plaintiffs' known associates to interfere with the inner workings of Plaintiffs' business activity and hinder Plaintiffs' prospective business dealings with future prospective business partners.

353.   Defendants have persistently contacted Plaintiffs' lender, MTB, to interfere with Plaintiffs' contract with MTB by fraudulently claiming causes of action which Defendants are not entitled and which have defamed Plaintiffs.

354.   The interferences by Defendants were intentional, malicious, and without lawful justification.

355.   Furthermore, Defendants acted intentionally and with malice in filing their maritime lien and notifying all interested and prospective parties associated with Plaintiffs and the Yacht. Defendants did so to elicit funds from Plaintiffs by leveraging their false claims against the title to Plaintiffs' primary asset, the Yacht.

356.   Defendants were joint venturers with Plaintiffs. As is typical of joint venturers, Defendants were given access to information regarding the business activities and associates of Plaintiffs, the current status of affairs regarding the title to the Yacht, and various other internal, typically confidential, business dealings.

357.   Defendants saw opportunity in Plaintiffs' position within the joint venture and sought to create leverage against Plaintiffs.

358.   Defendants' campaign to acquire said leverage was pursued by fraudulently mischaracterizing their dealings with Plaintiffs and falsifying debts that they now claim are owed to elicit funds from Plaintiffs, MTB, and any other third parties that may have had an interest in the Yacht.

359.   Defendants accomplished their malicious endeavor by fraudulently billing for work that was never conducted or agreed upon. Defendants were aware of the maritime lien process, the ease of acquiring such a lien, and the damage such a lien would yield to the title of Plaintiffs' main asset. Further evidence of their malicious intent is shown by Defendants threats to Plaintiffs

and their associates for approximately one month prior to filing whereby Defendants attempted to elicit funds from Plaintiffs and create discord among their interested business associates and partners.

360.   When Plaintiffs refused to succumb to Defendants' extortionary tactics, Defendants acted upon their threats and filed for the lien. In doing so, Defendants succeeded in their intended goal of damaging Plaintiffs' relationships and significantly diminishing the value of Plaintiffs' primary asset, the Yacht. Such consequences were previously threatened by Defendants in order to extort funds from Plaintiffs, which clearly exhibits Defendants' intent to cause the harms described.

361.   As a direct result thereof, Defendants caused significant damages to Plaintiffs in an amount to be determined at trial.

## COUNT XI
### Promissory Estoppel

362.   Plaintiffs reincorporate by reference the preceding paragraphs of the Complaint as though fully set forth herein.

363.   Defendants promised and assured Plaintiffs that they were qualified to conduct all work that was contracted between the parties.

364.   Defendants promised and assured Plaintiffs that they would provide Plaintiffs with detailed accounting for all services and orders and provide the same to Plaintiffs upon request.

365.   Defendants promised and assured Plaintiffs that they were conducting part orders and providing services as they represented.

366.   Defendants promised and assured Plaintiffs that they would improve the Yacht.

367. Defendants promised and assured Plaintiffs that they would grant certain discounts and liberties in billing deadlines due to their joint venture and potential future business partnership together.

368. Defendants promised and assured Plaintiffs that they would hold Plaintiffs funds in trust, and that such funds would not be dispersed without Plaintiffs' consent and approval.

369. Plaintiffs acted in reliance of Defendants promises and assurances as detailed in 363 through 368.

370. Plaintiffs paid $49,000 in trust to be held by Defendants in reliance of the aforementioned representations.

371. Plaintiffs granted Defendants access to the Yacht in reliance of the promises and assurances made by Defendants.

372. Plaintiffs granted Defendants access to Plaintiffs' assets and property in reliance of the promises and assurances made by Defendants.

373. As a result of Plaintiffs' reliance on the promises and assurances made by Defendants, Plaintiffs have suffered, and continue to suffer damages in an amount to the determined at trial.

## COUNT XII
### Bailment

374. Plaintiffs reincorporate by reference the preceding paragraphs of the Complaint as though fully set forth herein.

375. Defendants had exclusive possession of the Yacht whereby Plaintiffs delivered them the only set of keys that grant access to the Yacht, for large periods of time upon commencement of their agreements.

376. Plaintiffs initially granted Defendants possession and control of the Yacht to conduct a Study Report and supply the Yacht with necessary engine components in order to restore the Yacht to proper working condition.

377. Defendants, as joint venturers, and pursuant to the terms of the agreements with Plaintiffs, maintained exclusive control and possession of the Yacht not only to supply essential components, but also to provide maintenance and protect the Yacht from foreseeable harms while it was in Defendants' possession.

378. While the Yacht was in the exclusive possession and control of Defendants, they failed to winterize the Yacht.

379. While the Yacht was in the exclusive possession and control of Defendants, a pipe burst due to Defendants' failure to winterize the Yacht, which has caused the Yacht significant damage.

380. While the Yacht was in the exclusive possession and control of Defendants, Defendants removed Plaintiffs' property without permission or authorization.

## COUNT XIII
### Breach of Fiduciary Duty

381. Plaintiffs reincorporate by reference the preceding paragraphs of the Complaint as though fully set forth herein.

382. As joint venturers with Plaintiffs, Defendants owed a fiduciary duty to Plaintiffs to properly care for and improve the Yacht, maintain meticulous records and accounting, and proceed throughout their dealings with Plaintiffs and the Yacht in good faith.

383. Defendants breached their fiduciary duty to Plaintiffs by failing to perform basic maintenance work to the Yacht.

384.    Defendants breached their fiduciary duty to Plaintiffs by failing to perform according to their agreements and proceeding with intentional acts taken to harm Plaintiffs and the Yacht.

385.    Defendants breached their fiduciary duty by committing fraud against Plaintiffs.

386.    Defendants breached their fiduciary duty by defaming Plaintiffs and harming Plaintiffs' reputation.

387.    Defendants breached their fiduciary duty by failing to restore the Yacht as promised.

388.    Defendants breached their fiduciary duty by stealing assets from Plaintiffs and the Yacht.

389.    Defendants breached their fiduciary duty to Plaintiffs by stealing Plaintiffs funds, which the Defendant agreed to hold in trust.

390.    Defendants breached their fiduciary duty to Plaintiffs by attempting to convert Plaintiffs' equity in the Yacht through fraudulent billing and a maritime lien based upon fraud, deception, and deceit.

391.    As a result of Defendants' breach of their fiduciary duty, Plaintiffs have suffered damages.

## COUNT XIV
### Violation of §43(a) of the Lanham Act

392.    Plaintiffs reincorporate by reference the preceding paragraphs of the Complaint as though fully set forth herein.

393.    This count is for unfair competition and false designation of origin under United States law, including Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

394. Defendants unauthorized use of the Troca One trademarks as alleged herein constitute use of a false designation of origin and misleading description and representation of fact.

395. Defendants' conduct as alleged herein is intended to and is likely to cause confusion, mistake, or deception as to the ownership, sponsorship, or approval of Defendants' commercial activities.

396. Defendants, in commercial advertising or promotion, have misrepresented the nature, characteristics, or qualities of their commercial activities.

397. Defendants' conduct as alleged herein has caused injury to Plaintiffs, the public, and the market for Troca One's brand in territories in which Plaintiffs have priority rights.

398. Defendants' conduct as alleged herein constitutes unfair competition and false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

**COUNT XV**
**Federal Trademark Dilution - Violation of §43(c) of the Lanham Act**

399. Plaintiffs reincorporate by reference the preceding paragraphs of the Complaint as though fully set forth herein.

400. This count is for trademark dilution under Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

401. Troca Brands, through long and exclusive use, advertising, and publicity, have become distinctive of Plaintiffs' goods and services and have become famous.

402. Defendants' acts as alleged herein are intentional and willful in violation of Section 43(c)(1) of the Lanham Act, 15 U.S.C. § 1125(c)(1) and have already caused Plaintiffs irreparable damage and diminished their good-will.

403.    Plaintiffs are entitled to, among other relief, an award of actual damages, Defendants' profits, enhanced damages and profits, reasonable attorney fees, and costs of the action under Sections 34 and 35 of the Lanham Act, 15 U.S.C. §§ 116 and 117, together with prejudgment and post-judgment interest.

### COUNT XVI
### Violation of Plaintiffs' Common Law
### Trademark Rights in the Troca One Brand

404.    Plaintiffs reincorporate by reference the preceding paragraphs of the Complaint as though fully set forth herein.

405.    Plaintiffs have the exclusive right to use the Troca Brands.

406.    Defendants knowingly and unlawfully have used, and continue to use, the Troca Brands for their benefit without authorization.

407.    Defendants' unauthorized use of the Troca Brands in territories in which Plaintiffs have priority rights as described herein, including use by Defendants in conjunction with marketing is likely to cause confusion, mistake, or deception and constitutes trademark infringement under applicable common law.

408.    Upon information and belief, Defendants' acts are willful with the deliberate intent to trade on the goodwill of the Troca Brands, cause confusion and deception in the marketplace, and divert interest and good will from Plaintiffs.

409.    Defendants, by the acts complained of herein, have caused Plaintiffs damages.

### COUNT XVII
### Trademark Dilution under Massachusetts Law

410.    Plaintiffs reincorporate by reference the preceding paragraphs of the Complaint as though fully set forth herein.

411.    This count is for trademark dilution under the laws of the Commonwealth of Massachusetts, Mass. Gen. Laws Chapter 110H §13.

412.    Troca Brands are famous marks.

413.    Troca Brands are highly distinctive.

414.    Troca One Brands are strong marks and are inherently distinctive or have acquired secondary meaning and distinctiveness through long and exclusive use, advertising, and publicity.

415.    Defendants' acts as alleged herein have caused and are likely to cause: (a) reduction in the value of the Troca Brands caused by actual or potential confusion; (b) injury resulting from the illegal use of the Troca Brands that tarnishes the reputation associated with the Troca Brands; and (c) diminution in the uniqueness, individuality, and distinctive quality of the Troca Brands.

## RELIEF REQUESTED

**WHEREFORE,** Plaintiffs respectfully requests judgment against Defendants as follows:

1.    Enter judgment in favor of all Plaintiffs on Counts II, III, IV, V, VI, VII, VIII, IX, XI, XII, and XIII, applying double or treble damages as the Court deems proper, and award reasonable attorney fees and costs;

2.    Enter judgment in favor of Plaintiff TY One on Count I and X; and

3.    Enter judgment in favor of Plaintiff Troca Holdings on Count XIV, XV, XVI, and XVII;

4.    Award reasonable attorney fees and costs to each Plaintiff.

5.    Issue a permanent injunction: (a) disallowing Defendants from asserting a maritime lien against Plaintiffs' vessel, the M/V Troca One Yacht; (b) declaring that the Notice of Lien asserted by Defendants against Plaintiffs' vessel be declared void; (c) ordering and directing Defendants to file and record appropriate documentation with

the United States Coast Guard National Vessel Documentation Center ("NVDC") and

other relevant agencies acknowledging the discharge of its claimed lien; (d)

prohibiting Defendants from accessing or boarding the M/V Troca One permanently;

(e) ordering that Defendants return Plaintiffs' irreplaceable assets; and

6.  Providing any other relief to Plaintiffs as the Court deems proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff respectfully demands a trial by jury on all claims so triable.

Respectfully submitted,

Date: May 12, 2021

*/s/ Anthony Bistany*
Anthony Bistany, Esq. BBO # 691850
10 Main Street, Suite L12
Andover, MA  01810
978-902-0661
tonybistany@gmail.com

*Counsel for Plaintiffs TY One Holdings*
*LLC, Boston East Brunswick Holdings LLC,*
*Troca Tyngsboro Hotel LLC, and*
*Troca Holdings LLC*

57